UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TYRONE WINSTON,

Plaintiff,

-v-

MICHAEL CAPRA,

Defendant.

21-CV-04615 (JAV)

OPINION AND ORDER

JEANNETTE A. VARGAS, United States District Judge:

Before the Court is a petition by Tyrone Winston ("Winston" or "Petitioner") for a writ of habeas corpus. ECF No. 1 ("Petition" or "Pet."). Winston seeks relief from two concurrent sentences of 22 years to life, following his convictions for two counts of second-degree robbery, in violation of Robbery Penal Law Sections 160.10 (1) and (2)(a), as a persistent violent offender. SR 179.[1] For the following reasons, the Petition is **DENIED**.

## BACKGROUND

### A. Factual Background

On May 26, 2016, a jury found Winston guilty of attacking and robbing Janet Caballero ("Caballero") in the elevator of her apartment building on February 2, 2014. Trial Tr. at 190:14, 229:20–230:3.[2]

---

[1] The State Record ("SR") in Petitioner's underlying criminal case is at ECF Nos. 39-2, 39-3, and 39-4.

[2] All transcripts refer to state court proceedings and are filed at ECF No. 39-5. Speakers are noted by citation unless otherwise indicated through context.

### 1. The Suppression Hearing

On March 13, 2014, Janet Caballero identified Petitioner in a photo array as one of the two men who had attacked and robbed her on February 2, 2014. Suppr. Hr'g Tr. at 8:14–13:19 (Vasquez); *id.* at 64:1-9. Two weeks later, Caballero identified petitioner in a lineup. *Id.* at 64:7-9, 65:1-9. Petitioner moved to suppress the identification evidence, and New York County Supreme Court Justice Bonnie G. Wittner ordered a hearing on the motion. SR 238-39; SR 197.

At that hearing, New York Police Department Detective Heriberto Vasquez ("Detective Vasquez") testified that he showed Caballero a photo array containing Petitioner's photograph on March 13, 2014. Suppr. Hr'g Tr. at 7:1–13:25, 33:7–35:25 (Vasquez). Immediately upon viewing the array, Caballero became visibly upset, pointed to Petitioner's photograph, and said, "[T]his is the person that put me in a headlock in the elevator and robbed me." *Id.* at 12:2–13:21, 36:4–40:25.

Two weeks later, Detective Vasquez conducted a lineup including Petitioner. Vasquez did not tell Caballero before she arrived at the precinct that day why she was needed and did not say that anyone was in custody for the robbery. *Id.* at 8:14–9:9. To ensure that Caballero did not see Petitioner or the fillers prior to the lineup, Vasquez escorted Caballero to a lounge far from the lineup room when she arrived. *Id.* at 19:14–20:25, 50:1-20. All six lineup participants were wearing hats and black t-shirts, were seated, and appeared to be approximately the same height. Petitioner chose to sit in position number one. *Id.* at 17:6-9, 21:8-25, 27:8-15, 54:1-25; SR 252-55. Once Petitioner and the fillers were inside the lineup room, Caballero entered

the viewing room. Vasquez read Caballero instructions for viewing the lineup, including that the "perpetrator may or may not be amongst the six people." *Id.* at 20:3-25, 23:5-7, 24:8-25 (Vasquez). Vasquez also cautioned Caballero not to assume that the police knew the identity of the perpetrator. *Id.* at 24:16-17. When the window curtain rose to reveal the lineup, Caballero again immediately became upset, started to cry, and identified Petitioner as the person who had "placed her in a headlock inside the elevator." *Id.* at 25:7-13, 55:18–56:22. Detective Vasquez did not ask Caballero any questions other than whether she recognized anyone in the lineup, nor did he make any suggestions or recommendations to her when she viewed the lineup. *Id.* at 25:14-24, 57:4-16. Defense did not present evidence at the hearing.

At the conclusion of the hearing, the court denied the motion in its entirety, ruling that "the lineup and photo array were conducted properly." Suppr. Hr'g Tr. at 65:12-16. As pertinent here, the court ruled that the lineup "met constitutional standards" and was "certainly not unreasonably suggestive." *Id.* at 64:23–65:1. In particular, the court found that, although one of the fillers in the lineup "possibly" was "somewhat thinner" than the rest, all six were black men of similar complexion, wearing similar clothing, and that all were seated "to limit any height disparity." *Id.* at 64:17-23.

**2. Timing of Trial**

Petitioner was arrested on March 26, 2014, and arraigned on the indictment on June 26, 2014. Trial Tr. at 127:15-25, 128:8-12 (Detective Alickaj); SR 185.

Petitioner filed an omnibus motion on July 29, 2014, to which the prosecution responded on August 7, 2014, and the court issued a decision on September 4, 2014. SR 198-216, 222. According to a decision on Petitioner's subsequent New York Criminal Procedure Law ("CPL") Section 30.30 motion to dismiss, Petitioner's first attorney, retained counsel David Segal ("Segal"), was not present during the September 4, 2014 proceeding or a subsequent October 16, 2014 conference. *Id.* at 222. During the latter, the court remarked that "[t]his is not the first time Mr. Segal has not appeared," and said it would relieve him if he failed to appear on November 13. October 16, 2014 Tr. at 2:3-6. At the November 13 conference, Segal again failed to appear. The court stated that Segal was involved in a trial, but also noted that Segal "never comes." November 13, 2014 Tr. at 2:5-10. The court advised Petitioner to speak to his family about hiring another lawyer and scheduled the case for trial on January 5, 2015. *Id.* at 1, 2:14-15.

At the January 5 appearance, new counsel, H. Hershel Katz ("Katz" or "defense counsel"), was appointed and requested additional time to prepare the case. SR 222. Katz was not present at the next court date, February 11, 2015, because he was on trial elsewhere. February 11, 2015 Tr. at 2:1-4. The court set March 26, 2015, as a "control date" after the prosecutor said Katz had not yet had a chance to speak with Petitioner. *Id.* at 2:20-23. During the next appearance, Katz asked for another control date "to further investigate," and the court scheduled the matter for April 30, 2015. March 26, 2015 Tr. at 3:6-8. At the April 30 conference, Katz suggested that the court set a trial date "three to four weeks" away, but the

prosecutor asked for a date after June 18. The court scheduled the trial and suppression hearing for June 25, 2015. April 30, 2015 Tr. at 2:12-21, 3:1-5.

The prosecution was not ready for trial on June 25, 2015, and requested a two-week continuance. June 25, 2015 Tr. at 2:9-10. The court scheduled trial for July 15. *Id*. at 3:11. On that date, defense counsel said he had several health and scheduling issues and was unable to begin the trial for some period of time. The prosecutor suggested that they at least proceed with the suppression hearing the following week. The court scheduled the hearing for July 23. July 15, 2015 Tr. at 2:21–6:13. On that date, because the prosecution was not available until the afternoon and defense counsel was not available the next day, the court rescheduled the case to September 8, 2015, for both the suppression hearing and trial, with the consent of the defense. July 23, 2015 Tr. at 3:4–4:20.

On September 8, October 1, and October 5, defense counsel was on trial in another case. September 8, 2015 Tr. at 2:6–4:19; October 1, 2015 Tr. at 2:1-12; October 5, 2015 Tr. at 2:1-12. The suppression hearing was held on October 7, 2015. At its conclusion, defense counsel stated that the parties had agreed to an October 19 trial date. Suppr. Hr'g Tr. at 66:8-14. The prosecutor informed the court that Caballero, who had moved out of state because "of intimidation by [Petitioner] and other people in the neighborhood," had been scheduled to return that week for the trial, but the prosecution cancelled her flight "so she would not be waiting all week." *Id.* at 65:17–66:3.

Defense counsel was ill on October 19 and sent a request for a month-long

delay. The court scheduled trial for November 16, 2015. October 19, 2015 Tr. at 2:1-12. The prosecution was not ready for trial on November 16 and requested trial be set for December 8, 2015. SR 232. On that date, the prosecutor requested a one-week continuance because she was transferring to a new section of her office. Defense counsel requested a date in January because juries would be unavailable starting the next week. The prosecutor, however, noted that Caballero, who was pregnant, might be unable to travel in January. The case was scheduled for January 7, 2016. December 8, 2015 Tr. at 2:6–3:23, 5:1-12. On January 7, the case was adjourned because Katz announced his intention to file a motion to dismiss pursuant to CPL Section 30.30. SR 224, 233.

On January 18, 2016, defense counsel filed an affirmation of his motion under CPL Sections 30.20 and 30.30. SR 225-27 ("Speedy Trial Aff."). Section 30.20 provides, in pertinent part, that a "defendant is entitled to a speedy trial." CPL § 30.20(1). This statute "'embod[ies] the federal constitutional speedy trial right[.]'" *Parrish v. Lee*, 10-CV-8708 (KMK), 2015 WL 7302762, at *12 (S.D.N.Y. Nov. 18, 2015). While Petitioner cited Section 30.20 in his notice of motion, SR 224, and declared that the delay "violated [his] right to due process as guaranteed by the Constitution of this State and the United States and CPL § 30.30," Speedy Trial Aff., ¶ 31, all of Petitioner's arguments pertained to the government's purported failure to be ready for trial within 180 days, as required in CPL Section 30.30(1)(a), *see* Speedy Trial Aff. The court issued a written decision denying Petitioner's

motion on February 11, 2016, construing the motion only to raise a claim under CPL Section 30.30. SR 222-23.

At a subsequent appearance on March 7, 2016, the prosecution was again not ready for trial and requested a trial date of March 21, 2016. March 7, 2016 Tr. at 1:20-23. The prosecution announced that it was ready to proceed on March 21 but requested that the court "pass" the case for one week, until March 28, 2016, to begin jury selection, explaining travel was difficult for Caballero given the upcoming Easter holiday. Defense counsel did not object. March 21, 2016 Tr. at 2:4-17. The attorneys appeared two days later, however, after the prosecutor received a March 22, 2016 order from a court in Texas, where Caballero lived, ruling that it would not order Caballero to appear for trial in New York until May 18, 2016, due to "hardship [that] is limited in duration." March 23, 2016 Tr. at 2:13–3:17, SR 251. The prosecutor explained that Caballero had given birth ten days prior and had argued in Texas that she could not leave her child, and it would be dangerous for her unvaccinated infant to travel for the March trial date. March 23, 2016 Tr. at 2:18–3:14. The court continued the case until May 18, "ruling [that] this is [an] exceptional circumstance." *Id.* at 4:6-8. Voir dire in Petitioner's trial began on May 19, 2016. May 19, 2016 Tr. at 32:1-15.

### 3. Caballero's Testimony Regarding the Robbery

At Petitioner's jury trial, Caballero testified as follows.

In the early morning hours of February 2, 2014, Caballero returned home after a night out to her apartment building in the Polo Grounds housing project in

Manhattan. Trial Tr. at 17:21-25, 22:3–23:6. After Caballero entered her building elevator and pressed the button for the 24th floor, a man wearing a blue hat also entered the elevator and pressed the button for the 21st floor. *Id.* at 24:12-17, 28:14-18, 92:7-17. Just before the doors closed, Petitioner and "a friend," a man Caballero did not recognize, entered the elevator. Neither Petitioner nor his friend pressed a button for a floor. *Id.* at 24:17-19, 27:22-25, 28:19-25. Caballero had seen Petitioner around the Polo Grounds complex about 15 to 20 times in the two years she had lived there and had spoken with him on multiple occasions. *Id.* at 21:13-17, 24:17-21. The first time she met him, he had approached her at a neighborhood store, flirted with her, and tried to get her phone number, which she declined to offer. *Id.* at 20:3-21. Thereafter, she frequently saw him at the same store and in other places in the neighborhood, including in the lobby of her apartment building, in front of her building, on benches in the complex courtyard, and outside the nearby subway station. *Id.* at 21:3–22:17, 53:11, 54:5-21, 80:23–81:14, 102. After their first conversation, Petitioner and Caballero would greet each other whenever they saw each other. *Id.* at 87:10-14.

After Petitioner and his friend entered the elevator, Petitioner stood face to face with Caballero for a moment, then turned to face the elevator door. Trial Tr. at 24:21-25, 26:19-25, 28:1-10. Petitioner did not acknowledge Caballero, which she thought was strange since they always spoke whenever they saw one another. *Id.* at 24:16-25, 25:9-14. At the 21st floor, the man in the blue hat exited the elevator. *Id.* at 25:1-12. Petitioner and his friend then repositioned themselves, one on either

side of Caballero. *Id.* When the doors opened on the 24th floor, Caballero began to step out of the elevator, but Petitioner grabbed the back of her neck and pulled her back inside. *Id.* at 25:15-17, 93. Petitioner wrapped his forearm around her neck, bent her head so that she could not breathe, and choked her "really, really hard." *Id.* at 25:17-19; *id.* at 3:10-15. As Petitioner's friend rummaged through the bags Caballero had been carrying, Petitioner demanded, "Where's the money, bitch," then announced, "I'm about to kill this bitch. I'm gonna kill this bitch." *Id.* 25:20–26:5, 93. Caballero could not breathe or speak. *Id.* at 25:25–26:3, 30:16-21. The elevator door opened on the 29th floor and Petitioner and his friend pushed Caballero out. When Caballero turned back to retrieve her bags, Petitioner demanded, "Don't turn around; don't look at me." *Id.* at 26:10-12. The two men then tossed Caballero's bags out of the elevator. *Id.* at 26:13. Petitioner and his friend stole $460 in cash, as well as Caballero's cell phone and identification. *Id.* at 35:7-11, 94.

After the robbery, Caballero called 911 from her apartment and told the responding police officers that she recognized one of the robbers—Petitioner—from the neighborhood and would be able to identify him. *Id.* at 34:4-5, 35:1-15, 97-98. Caballero provided a description of Petitioner's height and build. *Id.* at 97.

**4. Additional Evidence at Trial**

Surveillance footage from cameras in the building lobby and on the building's exterior was admitted into evidence as People's Exhibit 4. Trial Tr. at 55:2-25 (various). The footage showed Caballero entering the elevator at 2:49 a.m., followed

by the man in the blue hat and then by Petitioner and his friend, both of whom wore hooded sweatshirts. *Id.* at 56:16–62:25 (Caballero). Detective Vasquez created a "wanted" poster using still shots of the robbers from the videotape. *Id.* at 141:24–142:2 (Vasquez).

When Detective Vasquez interviewed Caballero, she provided descriptions for both Petitioner and his accomplice and said that she had seen Petitioner regularly around the Polo Grounds complex. *Id.* at 138:18–140:22, 149:9-22 (Vasquez). As discussed *supra*, Detective Vasquez showed Caballero a photo array containing Petitioner's photograph on March 13, 2014, wherein she positively identified Petitioner. *Id.* at 101 (Caballero); Supp. Hr'g Tr. at 7:1–14:14 (Vasquez).

On March 26, 2014, almost eight weeks after the robbery, the police received information about Petitioner's location and arrested him in the Polo Grounds parking lot. Trial Tr. at 127:8–128:1, 133:17-25 (Detective Alickaj). Petitioner admitted that he lived in one of the housing project's four apartment buildings. *Id.* at 146:11-18 (Vasquez).

The next day, Caballero viewed a lineup. *Id.* at 142:1-25 (Vasquez); *id.* at 37:1-5, 99-101 (Caballero). Detective Vasquez took Caballero into the lineup room and asked whether she recognized anyone. *Id.* at 144:1-9 (Vasquez); *id.* at 37:6-20, 99-101 (Caballero). Caballero immediately identified Petitioner as one of the two men who had robbed her. *Id.* at 37:24–39:6, 99-101 (Caballero); *id.* at 144:11–145:16 (Vasquez).

A few days after Caballero had identified Petitioner in the lineup, someone slipped Caballero's stolen identification card under her apartment door. Trial Tr. at 108-109 (Caballero). Frightened by this, Caballero stopped living in her apartment. *Id.* at 110 (Caballero).

About a week after the lineup, Caballero and her boyfriend Steven were walking near the Polo Grounds project when Petitioner approached and asked if he could talk to Caballero. *Id.* at 45:17–46:7, 50:14-21, 103-04 (Caballero). Caballero said that she did not want any problems and did not want to speak to Petitioner. *Id.* at 46:2-7, 50:21-25. Caballero's boyfriend asked, "Were you the one that robbed my girlfriend?" Petitioner responded, "Yeah, but I just want to squash everything. I just want to squash the whole situation." *Id.* at 46:8-11, 51:7-12, 104. Petitioner said he wanted to pay back the money and resolve the situation, because he did not want to go to jail. *Id.* at 104. Petitioner and Steven stepped aside and spoke privately. During that conversation, Caballero saw Petitioner hand Steven $500 in cash. *Id.* at 51:15–52:6, 104-05. After this encounter, Caballero stopped going to the Polo Grounds altogether and moved out of state three months later. *Id.* at 52:9-11, 54:22–55:1, 105-06, 110.

As a result of the attack by Petitioner, Caballero experienced bruising along her jawline from chin to ear. *Id.* at 35:19-25. Her neck became so swollen and sore that she could not touch it. *Id.* The pain was so severe that Caballero could not swallow even her own saliva, and she was unable to eat for approximately one week. *Id.* at 35:19–36:9. The visible bruising lasted for about four days. *Id.* at

36:15-16. Caballero did not go to the hospital for treatment because she thought she could address the injury herself. *Id.* at 36:1-3.

#### 5. Prosecutor's Closing

In discussing the theft of Caballero's identification, the prosecutor posited that it was stolen in a "sort of Soprano's [move] or one of those other mob stories where you want to let the person know you know who they are, or where they are, just in case they speak." Trial Tr. at 186:7-10.

### B. Post-Trial Procedural History

#### 1. Direct Appeal

As relevant here, Petitioner's counseled brief on direct appeal asserted that: (1) the trial court erred in summarily denying Petitioner's motion to dismiss pursuant to CPL Section 30.304, SR 27-42, 44-47, 161-72; (2) pretrial delay denied Petitioner the constitutional right to a speedy trial, SR 42-44; (3) the verdict was against the weight of the evidence because the victim's testimony regarding her physical injury "was improbable and uncorroborated," SR 48-52; (4) defense counsel provided ineffective assistance by failing to object (a) when Detective Vasquez's trial testimony suggested that Caballero had identified Petitioner in the lineup, improperly bolstering her identification, and (b) when the prosecutor made improper summation comments, SR 52-60; and (5) the lineup was unduly suggestive, SR 60-62.

Petitioner also filed a pro se brief in which he contended that: (1) his constitutional speedy trial right was denied by the trial court's miscalculation of

"the chargeable time" due to the pretrial delays, SR 77-84, and (2) Caballero's identification of Petitioner was unreliable and "incredible as a matter of law," SR 85-87. Petitioner did not raise a specific challenge to either the photo array or lineup procedures in his argument regarding the identification.

The Appellate Division, First Department, unanimously affirmed Petitioner's conviction. *People v. Winston*, 177 A.D.3d 524 (2019); SR 258-61. The Appellate Division held that Petitioner's statutory speedy trial claim pursuant to CPL § 30.30 was unpreserved for review and declined to review it in the interests of justice. SR 258. In the alternative, the court held that Petitioner's claim was meritless. SR 259. Although the Appellate Division found that forty-two additional days should have been included in the motion court's calculation of time not attributable to the defense, the court held that discrepancy was harmless because, "[w]hen the additional days that should have been included are added to the time the motion court included, [Petitioner's] speedy trial claim still falls short of the threshold for dismissal." SR 259.

The Appellate Division further concluded that Petitioner was not denied his constitutional right to a speedy trial, noting that "[a]lthough the 26-month delay, including a long period of incarceration, was significant, more than half of the delay is attributable to the defense, the crime was serious and [Petitioner] has not demonstrated any specific prejudice." SR 259-60 (citing *People v. Taranovich*, 37 N.Y.2d 442 (1975)).

The Appellate Division also held that the verdict was not against weight of the evidence, per one of Petitioner' state law claims, finding "no basis for disturbing the jury's credibility determinations, including those relating to the victim's testimony in support of the element of physical injury." SR 260 (citation omitted).

As for Petitioner's ineffective counsel claims, the Appellate Division determined that they were "unreviewable on direct appeal because they involve matters outside the record." *Id.* In an alternative ruling, the Appellate Division determined that Petitioner had "received effective assistance under the state and federal standards." *Id.* (citing *People v. Benevento,* 91 N.Y.2d 708, 713-14 (1998), *Strickland v. Washington,* 466 U.S. 668 (1984)). The court also declined to exercise its "interest of justice" authority to review the claims underlying Petitioner's ineffective assistance claims—specifically, the "evidentiary and summation error" claims that counsel had failed to preserve for appellate review. *Id.* As an alternative ruling, the court held that neither claimed error provided a "basis for reversal." SR 260-61.

The Appellate Division also rejected Petitioner's claim that the lineup was unduly suggestive. After reviewing the lineup photograph, the court found that Petitioner was not "singled out." SR 261. Finally, the court stated that it had "considered and rejected [Petitioner's] pro se arguments." *Id.*

Petitioner filed a counseled leave application seeking review of all issues raised in Petitioner's counseled and *pro se* briefs to the Appellate Division. SR 262-

63. On February 10, 2020, the New York Court of Appeals denied leave to appeal. *Winston*, 34 N.Y.3d 1164 (2020); SR 264.

**2. CPL § 440.10 Motions**

In a May 12, 2022 motion to vacate his conviction under New York CPL § 440.10, Petitioner contended his trial counsel was ineffective for: (1) failing to convey to him a plea offer of 12 years to life that Petitioner claimed he would have accepted; and (2) failing properly to preserve and challenge a federal constitutional speedy trial claim and/or a state statutory speedy trial claim. SR 265-81. As these claims are not raised in the Petition, this Court does not address them in greater detail. The 440 court summarily denied Petitioner's motion. SR 312-16.

The court also rejected on the merits and on procedural grounds Petitioner's claim that counsel was ineffective in connection with his statutory speedy trial motion. The 440 court noted, as the Appellate Division had concluded in an alternative holding, that Petitioner's statutory speedy trial claim and ineffective-counsel claim were meritless because "even if Counsel had included every chargeable adjournment in his motion, it would have still been unsuccessful." SR 315. Moreover, because the Appellate Division had determined that the underlying speedy trial claim was meritless, the 440 court held that the ineffective counsel-claim based on this issue was procedurally barred from review. *Id.* (citing CPL § 440.10(2)(a), which requires the denial of a motion to vacate a judgment when the ground or issue raised upon the motion was previously determined on the merits upon an appeal from the judgment).

On September 4, 2023, Petitioner filed a motion in the trial court to renew or reargue the denial of his Section 440.10 motion, renewing both claims made in the prior motion. SR 317-23. Construing Petitioner's motion as a new Section 440.10 motion as well as a motion to renew or reargue the prior motion, the court summarily denied the motion to vacate conviction for the same reasons stated in the prior decision and found no basis for granting the motion to renew or reargue the prior motion. SR 338-43. Petitioner sought leave to appeal the court's decision only as to the unconveyed plea offer claim. SR 344-47. On December 3, 2024, the Appellate Division denied leave to appeal. SR 353.

## LEGAL STANDARDS

A "district court shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only" under certain conditions, as stated in relevant part below. 28 U.S.C. § 2254(a); 28 U.S.C. § 2254(a)-(i).

It is "not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (citation omitted); *see* 28 U.S.C. § 2254(a). Thus, where a petition raises issues of state law, a federal court may not grant relief "unless such misapplication violates the Constitution, laws, or treaties of the United States." *Ponnapula v. Spitzer*, 297 F.3d 172, 182 (2d Cir. 2002).

"Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *see* 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State."). The Supreme Court has explained that "[b]ecause the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts," people held in state custody "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845; *accord Smith v. Duncan*, 411 F.3d 340, 347 (2d Cir. 2005). Thus, a petitioner is required to have presented each claim to all available levels of the state courts before seeking federal relief. *See, e.g.*, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) ("[T]he prisoner must fairly present his claim in each appropriate state court" including "a state supreme court with powers of discretionary review[.]" (cleaned up)). Federal claims are fairly presented by even a "minimal reference" to the provision of federal law that the petitioner relies upon. *Reid v. Senkowski*, 961 F.2d 374, 376 (2d Cir. 1992) (per curiam) (holding that a reference to the Fourteenth Amendment in a caption heading of an appellate brief is sufficient for exhaustion purposes); *accord Davis v. Strack*, 270 F.3d 111, 122 (2d Cir. 2001). Notwithstanding the exhaustion requirement, however, "[a]n application for a writ

of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).

Even upon the exhaustion of all claims, a petition for a writ of habeas corpus may not be granted with respect to any claim that has been "adjudicated on the merits" in state court, unless the state court's adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

For a claim to be "adjudicated on the merits" within the meaning of Section 2254(d), the state court decision must "finally resolv[e] the parties' claims, with res judicata effect," and the decision must be "based on the substance of the claim advanced, rather than on a procedural, or other, ground." *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001). As long as "there is nothing in [the state court's] decision to indicate that the claims were decided on anything but substantive grounds," a claim will be considered "adjudicated on the merits" even if the state court gives "[n]o . . . articulation of its rationale or elucidation of its reasoning process." *Aparicio v. Artuz*, 269 F.3d 78, 94 (2d Cir. 2001); *accord Harrington v. Richter*, 562 U.S. 86, 99 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed

that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."); *id.* at 98 (Section 2254(d) deference applies even "[w]here a state court's decision is unaccompanied by an explanation"). Thus, a court must "extend considerable deference even to deficient reasoning, at least in the absence of an analysis so flawed as to undermine confidence that the constitutional claim has been fairly adjudicated." *McCray v. Capra*, 45 F.4th 634, 640 (2d Cir. 2022) (cleaned up).

In determining clearly established federal law, only holdings of the Supreme Court are considered. *Rodriguez v. Miller*, 537 F.3d 102, 106 (2d Cir. 2008). Thus, "[n]o principle of constitutional law grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court can provide the basis for habeas relief." *Id.* at 106-07. Where there is "[n]o holding" from the Supreme Court on the question presented, *Carey v. Musladin*, 549 U.S. 70, 77 (2006), or where Supreme Court cases "give no clear answer" to the question presented in the petition, *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam), a state court's decision can be neither contrary to nor an unreasonable application of clearly established federal law. A state court decision is "contrary to" clearly established federal law only "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

Habeas relief is available under the "unreasonable application" clause only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly," *id.* at 411, but only where the state court's application of Supreme Court precedent is so unreasonable that "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" it. *Richter*, 562 U.S. at 102 ("[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable."); *accord Woods v. Donald*, 575 U.S. 312, 318-19 (2015) (per curiam) (emphasizing that federal habeas relief is available only where there is an "extreme malfunction" by the state court in applying Supreme Court precedent). The "determination of whether a court has unreasonably applied a legal standard depends in large measure on the specificity of the standard in question." *Brisco v. Ercole*, 565 F.3d 80, 89 (2d Cir. 2009). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations" inasmuch as the application of a general standard to a specific case "can demand a substantial element of judgment." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). Further "it is the habeas applicant's burden to show that the state court applied [federal law] to the facts of his case in an objectively unreasonable manner." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam); *accord Cullen v. Pinholster*, 563 U.S.

170, 181 (2011) ("The petitioner carries the burden of proof."). Section 2254 further mandates that "a determination of a factual issue made by a State court shall be presumed to be correct" and must be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Finally, "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (cleaned up); *accord Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam). This applies with equal force to a pro se habeas petition. *See, e.g.*, *Enrique Santiago v. United States*, 385 F. Supp. 3d 209, 211 (S.D.N.Y. 2019) ("[B]ecause [habeas petitioner] is a pro se litigant, his submission must be held to 'less stringent standards than formal pleadings drafted by lawyers'" (quoting *Ferran v. Town of Nassau*, 11 F.3d 21, 22 (2d Cir. 1993))). The Court thus construes Winston's claims "liberally and interpret[s] them to raise the strongest arguments that they suggest." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (cleaned up). Nonetheless, a pro se litigant is not exempt "from compliance with relevant rules of procedural and substantive law." *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) (citation omitted); *accord Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (per curiam).

## DISCUSSION

In his habeas petition, Winston seeks relief from his conviction on the following four grounds: (1) the prosecution failed to be ready for trial after more than six months, violating his right to a speedy trial; (2) the jury reached a guilty

verdict against the weight of the evidence where "complainant's testimony regarding physical injury was improbable and uncorroborated"; (3) "defense counsel provided ineffective assistance by failing to object . . . when a police witness improperly testified that the complainant identified Winston in a pre-trial lineup and when the prosecutor impugned the defenses and baselessly compared Mr. Winston to a mafioso" during closing; and (4) the pretrial lineup in which Winston was identified was unduly suggestive and violated due process because "four fillers had much darker skin tones than Mr. Winston and the fifth was visibly younger and thinner." Pet. at 4-10.

**A. Speedy Trial Claim**

Insofar as Petitioner asserts that the trial court erred in denying his speedy trial motion "where well over six months of chargeable time had elapsed" on state law grounds, *see, e.g.*, CPL § 30.30(1) (requiring the government to be ready for trial within six months of a felony charge), that claim is not brought under federal law and thus not cognizable on habeas review. 28 U.S.C. § 2254(a). To the extent that Petitioner's claim can be construed as a Sixth Amendment speedy trial claim, the Court must review that claim—as one rejected on the merits by the Appellate Division—under the deferential standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See* 28 U.S.C. § 2254(d); *Parker v. Ercole*, 666 F.3d 830, 833 (2d Cir. 2012). Accordingly, Petitioner is only entitled to relief if he can establish that the state court's denial of his federal claim was

"contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1).

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. Const. amend. VI. The speedy trial right is "necessarily relative. It is consistent with delays and depends upon circumstances." *Barker v. Wingo,* 407 U.S. 514, 522 (1972) (cleaned up). The Supreme Court has refused to "quantif[y]" the right "into a specified number of days or months." *Id*. at 523. In *Barker*, the Supreme Court established a "balancing test, in which the conduct of both the prosecution and the defendant are weighed." *Id*. at 530. "[S]ome of the factors" that courts should weigh include the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id*.; *accord Vermont v. Brillon*, 556 U.S. 81, 90 (2009). "Because the attorney is the [defendant's] agent when acting, or failing to act, in furtherance of the litigation, delay caused by the defendant's counsel is also charged against the defendant." *Brillon,* 556 U.S. at 90-91 (cleaned up).

The length of the delay in Petitioner's case—well beyond a year—was sufficient to trigger a *Barker* inquiry. *See Smith v. La Clair*, 353 F. App'x 486, 488 (2d Cir. 2009) (citing *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992)). "But delay alone is not sufficient to establish a Sixth Amendment violation." *United States v. Dunnigan*, No. 23-6353, 2025 WL 470300, at *2 (2d Cir. Feb. 12, 2025) (summary order) (citing *United States v. Cabral*, 979 F.3d 150, 157 (2d Cir. 2020)); *see also Flowers v. Warden, Connecticut Corr. Inst., Somers*, 853 F.2d 131, 133 (2d

Cir. 1988) (surveying Second Circuit cases with delays between 21 months and 6 years where no speedy trial violation was found). When a delay results, for instance, for "a valid reason, such as a missing witness," the Sixth Amendment is not violated, *Barker,* 407 U.S. at 531, in contrast to "delay stemming from deliberate government misconduct." *United States v. Moreno*, 789 F.3d 72, 79 (2d Cir. 2015) (citing *Doggett,* 505 U.S. at 656). Moreover, a "delay caused by the defense weighs against the defendant." *Brillon,* 556 U.S. at 90.

The Appellate Division concluded that Petitioner's constitutional right to a speedy trial was not denied because "[a]lthough the 26-month delay, including a long period of incarceration, was significant, more than half of the delay [wa]s attributable to the defense, the crime was serious[,] and [Petitioner] has not demonstrated any specific prejudice." SR 259-60. Petitioner's first retained attorney, Segal, missed at least three court dates in late 2014. When Petitioner's second attorney, Katz, was appointed in January 2015, he requested a continuance to investigate and prepare for trial; he again sought a continuance in March 2015 to conduct further investigation. March 26, 2015 Tr. at 3. Later in 2015, the defense was granted several continuances due to Katz's unavailability because of other cases, illness, and vacation. The filing of the defense's motion to dismiss in January 2016 led to a delay of several months.

Although the prosecution requested continuances on several occasions in 2015, nothing in the record suggests improper reason for the delays. The record also does not reflect that the defense lodged any objections to these continuances, at

least until Petitioner filed his January 2016 motion to dismiss. The prosecution thereafter requested a two-week continuance on March 7, 2016, which was granted, again without objection. On March 23, however, the prosecution announced it would not be ready due to Caballero's unavailability following the birth of her child. This caused two months' delay, but, as the trial court determined, the circumstances were "exceptional" because Caballero lived out of state and a Texas court had ordered that she would not be required to appear in New York until May. March 23, 2016 Tr. at 2:1–4:8.

Neither Petitioner's assertion of his Sixth Amendment right, nor prejudice caused by the delay of his trial, weigh in favor of his Sixth Amendment claim. His January 2016 motion was largely statutory and was not filed until over 21 months after his arrest. *See, e.g.*, *Mills v. Poole*, No. 06-CV-00842A, 2008 WL 2699394, at *24 (W.D.N.Y. June 30, 2008). In assessing whether a criminal defendant was prejudiced by pretrial delay, a court must consider whether: (i) the pretrial incarceration was oppressive; (ii) a speedier trial would have minimized the "anxiety and concern of the accused;" or (iii) the defense was impaired by the delay. *Barker*, 407 U.S. at 532. Petitioner, however, argues none of these grounds.

On balance, the reasons for the delay in Petitioner's trial do not support a Sixth Amendment violation in contravention of the Appellate Division's ruling.

**B. "Weight of the Evidence" Claim**

Petitioner contends, as he did on direct appeal, that the verdict against him was against the "weight of the evidence" because Caballero's testimony regarding

her "injury was improbable and uncorroborated." Pet. at 6; SR 48-52. A "weight of the evidence" claim is a New York state law claim brought under CPL Section 470.15 with no equivalent federal analogue. *See McKinnon v. Sup't, Great Meadow Corr. Fac.*, 422 F. App'x 69, 75 (2d Cir. 2011); *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996); *People v. Bleakley*, 69 N.Y.2d 490, 495 (1987). On direct appeal, Petitioner did not assert a federal claim because he did not assert, as would be required under federal law, that Caballero's testimony was "legally insufficient" to support his conviction. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A weight-of-the-evidence claim is distinct from a legal sufficiency claim, as even a legally sufficient case may not withstand a weight-of-the-evidence challenge. *See Bleakley,* 69 N.Y.2d at 495 (acknowledging that each doctrine "requires a discrete analysis"). Indeed, Petitioner acknowledged in Point II of his counseled brief on direct appeal that the prosecution's evidence in his case *was* legally sufficient, and that he was thus challenging only the weight of the evidence. SR 48.

The Court nonetheless disposes of Petitioner's claim on the merits. As the Appellate Division noted, "[t]here is no basis for disturbing the jury's credibility determinations, including those relating to the victim's testimony in support of the element of physical injury." *Winston*, 177 A.D.3d at 525 (citation omitted).

The Supreme Court has established that evidence is legally sufficient if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. "*Jackson* claims face a high bar in

federal habeas proceedings because they are subject to two layers of judicial deference." *Johnson*, 566 U.S. at 651; *accord Parker v. Matthews*, 567 U.S. 37, 38 (2012) (per curiam); *McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010). "First, on direct appeal, 'it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.'" *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam)). "And second, on habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* (citations omitted). That is, the writ must be denied if it is "possible" that a fair-minded jurist could agree with the state court's decision. *Richter*, 562 U.S. at 102.

The evidence here more than satisfied this standard. As a result of Petitioner's attack, Caballero's neck was "very, very sore," so sore that she could not touch it. Trial Tr. at 35:20-24 (Caballero). The day following the attack, the pain in her neck and throat was "really bad" so that she could not swallow even her own saliva. *Id.* at 36:4-9. She was bruised from chin to ear. *Id.* at 35:19-20, 36:10-14. The bruising and swelling lasted four days, and the soreness lasted an entire week, during which Caballero could not eat. *Id.* at 35:20-21-36:15-16 (Caballero). This testimony was sufficient to establish physical injury. *See, e.g.*, *People v. Greene*, 70

N.Y.2d 860, 862-63 (1987) (finding sufficient evidence of injury where defendant "grabbed the victim around the neck, pushed him to the floor, and choked him," causing victim to briefly lose consciousness and stop breathing for a moment, and the victim had "difficulty swallowing for two days after the incident"); *People v. Jones*, 156 A.D.3d 440 (1st Dep't 2017) ("The victim's testimony that she had difficulty swallowing for two weeks after the incident as the result of being choked supports a finding of physical injury.").

**C. Ineffective Assistance Claim**

Petitioner has not properly exhausted his ineffective-counsel claims. The Appellate Division held upon consideration of those claims that they were "unreviewable on direct appeal because they involve matters outside the record," SR 260 (citations omitted), and Petitioner had not, at the time, raised a CPL Section 440.10 motion, *see Fulton v. Graham*, 802 F.3d 257, 263 (2d Cir. 2015) ("[U]nder New York law, when, as here, a defendant's complaint about counsel is predicated on factors such as advice or preparation that do not appear on the face of the record, the defendant must raise his or her claim via a CPL 440.10 motion." (cleaned up)). That court, however, issued an alternative ruling, to the extent the record permitted review, that Petitioner's ineffective-counsel claims were meritless. SR 260.

Petitioner subsequently filed CPL Section 440.10 motions in state court (and stayed the instant action for four years to do so), but those motions still did not raise the ineffective assistance grounds he seeks to challenge through this habeas petition. *See* ECF Nos. 10, 32; *see* SR 265-69, 315. Accordingly, such claims are

unexhausted but not procedurally defaulted, as Petitioner could theoretically raise another CPL Section 440.10 motion. Because these claims can still be exhausted, the Court may "(1) dismiss the petition without prejudice so that the petitioner may exhaust his unexhausted claims; (2) stay the petition to allow the petitioner to return to state court and exhaust his claims; (3) allow the petitioner to delete the unexhausted claims and proceed with only his exhausted claims; or (4) deny the petition on the merits." *Guerriero v. Montagari*, No. 23-CV-01285 (DG), 2025 WL 218787, at *3 (E.D.N.Y. Jan. 16, 2025) (citations omitted); *see also Rhines v. Weber*, 544 U.S. 269, 277-79 (2005) (discussing same). The final option is most appropriate here, where Petitioner's renewal of Plaintiff's claims would be futile.

The Appellate Division found that, "to the extent the existing record permits review, . . . [Petitioner] received effective assistance under the state and federal standard" because the instances of alleged "evidentiary and summation error" provided "no basis for reversal." SR 260 (citations omitted). This Court does not find that conclusion to be contrary to, or an unreasonable application of, federal law.

Petitioner alleges ineffective assistance of counsel because his lawyer did not object to alleged hearsay testimony by Detective Vasquez regarding Caballero's identification of Petitioner in a police lineup. Detective Vasquez did not, however, provide such testimony, Trial Tr. at 142:4–45:16, so this aspect of Petitioner's claim has no basis. Petitioner also alleges ineffective assistance of counsel because his lawyer did not object to the prosecution's closing argument "impugning his

defenses," "vouch[ing] for Caballero's credibility," and characterizing him as a "mafioso." Pet. at 8.

To establish that he received ineffective assistance of counsel, Petitioner must show both that his attorney (i) provided objectively deficient representation and (ii) that he suffered prejudice as a result. *See Strickland* 466 U.S. at 687. As to the first prong, "decisions such as when to object and on what grounds are primarily matters of trial strategy and tactics, . . . and thus are virtually unchallengeable absent exceptional grounds for doing so." *United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005) (cleaned up); *see also United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) (noting that "appellate courts are ill-suited to second-guess" strategic decisions by trial counsel "unless there is no strategic or tactical justification for the course taken"). As to the prejudice prong, Petitioner is required to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Where the prosecution highlighted a lack of evidentiary support for defense counsel's claim that the incident in question was "an argument about money that was owed and due" rather than a robbery, *compare* Trial Tr. at 168:23-25 *with* 174:12–75:11, his comments were not clearly objectionable, s*ee United States v. Jaswal,* 47 F.3d 539, 544 (2d Cir.1995) (characterization of defense's case as a "fairy tale" was not improper); *People v. Guerrero*, 217 A.D.2d 411, 411 (1st Dep't 1995) (stating that "characterization of defendant's testimony as a 'fairytale'" was

"properly responsive to defense arguments and constituted fair comment on the evidence presented within the broad bounds of rhetorical comment permissible in closing argument"). Further, where the prosecution identified Caballero's apparent lack of ulterior motive for her testimony, the Court does not consider this to be improper "vouching" with respect to the prosecutor's "personal belief or opinion as to the truth or falsity of any testimony or evidence or guilt of the defendant." *United States v. Modica,* 663 F.2d 1173, 1178 (2d Cir. 1981) (quoting ABA Standards for Criminal Justice, Standard 3–5.8(b) (1980)). Finally, it was a "matter[] of trial strategy," *Cohen*, 427 F.3d at 170 (quotation marks omitted), for defense counsel not to object to the prosecution's characterization of Caballero's stolen identification as "sort of a Soprano's [move] or one of those other mob stories where you want to let the person know you know who they are, or where they are, just in case they speak," Trial Tr. at 186:7-10 (prosecution). Indeed, where defense counsel had otherwise challenged Caballero's credibility and the particulars of her stolen items, *see* Trial Tr. at 163:10–167:23 (defense), it may have been strategic not to "object[] and perhaps call[] attention to the offending remarks." *Broxmeyer v. United States*, 661 F. App'x 744, 748 (2d Cir. 2016) (summary order).

Further, "absent any prejudicial error in the Government's summation, the failure here to raise an otherwise futile objection could not have rendered counsel ineffective." *Cohen*, 427 F.3d at 170. At no point does Winston point to any prejudice caused by defense counsel's failures to object. The Court sees no reason to conclude that the Appellate Division's assessment that these claims were meritless

was contrary to, or an unreasonable application of, clearly established law. Accordingly, Petitioner's ineffective assistance claims are dismissed.

**D. Pretrial Lineup Claim**

The Appellate Division denied Petitioner's pretrial lineup claim on the merits. SR 261. Because that determination was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent, and it involved no unreasonable determination of the facts, this claim also provides no basis for habeas relief. *See* 28 U.S.C. § 2254(d).

The Supreme Court has established a two-part test for determining the admissibility of in-court identification testimony that follows suggestive pretrial identification procedures. First, the court must determine, under the totality of the circumstances, whether the "identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968) (upholding identification from photo array); *see also Manson v. Brathwaite*, 432 U.S. 98, 105-14 (1977); *Neil v. Biggers*, 409 U.S. 188, 196-97 (1972). If the procedure was not unduly suggestive, then the reliability of the identification testimony is a question that goes to the jury. *See, e.g., Jarrett v. Headley*, 802 F.2d 34, 42 (2d Cir. 1986). If, however, the procedure is found to be impermissibly suggestive, then the court must determine, under the totality of the circumstances, whether the identification was nevertheless reliable. *See Brathwaite*, 432 U.S. at 114.

The hearing court ruled that the lineup "met constitutional standards" and was "certainly not unreasonably suggestive." Suppr. Hr'g Tr. at 64:24–65:1. Although the court found that one of the fillers "possibly" was "somewhat thinner" than the rest, it noted that all six were black men of similar complexion, wearing similar clothing, and that all were seated "to limit height discrepancy." *Id.* at 64:17-23; *see* SR 252-53, 255 (lineup photos). The Appellate Division affirmed the trial court's ruling, concluding that based on its review of the lineup photograph, Petitioner was not "singled out." SR 261. This Court agrees with both courts' analyses.

Caballero's identification of Petitioner was also independently reliable on several other grounds. *See Biggers*, 409 U.S. at 198-99 (noting that unduly suggestive identification does not inherently require exclusion of evidence where identification was reliable considering totality of circumstances). Petitioner never challenged the validity of the photo array from which Caballero originally identified him, and her prior familiarity with Petitioner bolsters the reliability of her identification. *See, e.g.*, *Fabers v. Lamanna*, No. 18-CV-2399 (PKC), 2020 WL 1875288, at *8 (E.D.N.Y. Apr. 15, 2020) (where a reliability finding was "bolstered by the fact that, before identifying Petitioner in a lineup, [victim] also identified Petitioner in a photo array" that he had not argued was suggestive); *Animashaun v. New York*, No. 21-CV-2597 (KAM), 2024 WL 4266003, at *20 (E.D.N.Y. Sept. 23, 2024) (where victim's knowledge of petitioner "from the neighborhood," having

"interacted with him extensively on at least four occasions," supported a finding that identification was reliable).

Because the lineup including Petitioner was not unduly suggestive, Caballero's identification of him was otherwise reliable, and multiple state courts have reasonably rejected this claim on the merits, Petitioner is not entitled to relief on these grounds.

**CONCLUSION**

Accordingly, the Petition is denied in full. The Clerk of Court is directed to terminate all pending motions and close this case.

SO ORDERED.

Dated: July 22, 2026
New York, New York

JEANNETTE A. VARGAS
United States District Judge